Michael A. Sirignano, Esq.
Barry I. Levy, Esq.
Priscilla D. Kam, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance*
*Company, GEICO Indemnity Company, GEICO General*
*Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                Plaintiffs,

    -against-

ORTHOPAIN SUPPLY INC., ADAM YUSUPOV,
ORTHOSUPPLY112 INC., DMITRIY NEKTALOV, and
JOHN DOE DEFENDANTS "1" through "5,"

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:_____ (    )

**Plaintiff Demands a Trial by
Jury**

## COMPLAINT

    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against defendants Orthopain Supply, Inc., Adam

Yusupov, OrthoSupply112 Inc., Dmitriy Nektalov, and John Doe Defendants "1" through "5"

(collectively, the "Defendants"), hereby allege as follows:

## NATURE OF THE ACTION

1.      This action seeks to recover monies the Defendants wrongfully obtained from GEICO – and to expunge the pending fraudulent billing Defendants submitted to GEICO – relating to medically unnecessary, illusory, and otherwise unreimbursable durable medical equipment ("DME") in the form of Pulsed Electro-Magnetic Field Therapy devices, along with ancillary charges for pods, delivery, and education (collectively, the "PEMF Devices" or the "Fraudulent Equipment"). The Fraudulent Equipment was allegedly dispensed by OrthoSupply112, Inc. and Orthopain Supply, Inc. (the "DME Providers") to New York automobile accident victims insured by GEICO ("Insureds"). The Defendants dispensed the Fraudulent Equipment through the DME Providers based on forged, unauthorized, and illegally duplicated prescriptions, and without regard for whether the PEMF Devices have any documented efficacy for treatment of the Insureds.

2.      OrthoSupply112 Inc. ("OrthoSupply 112") is owned and controlled by Dmitriy Nektalov ("Nektalov").  Orthopain Supply Inc. ("Orthopain Supply") is owned and controlled by Adam Yusupov ("Yusupov").  Nektalov and Yusupov (collectively, the "Provider Owners"), working together with John Doe Defendants "1" through "5", devised a scheme to exploit New York's No-Fault insurance system by targeting the prescription and dispensing of PEMF Devices for which they billed GEICO $6,075.00 per patient who allegedly received one.  In furtherance of the scheme, Defendants colluded with the operators and managers (the "Clinic Controllers") of various No-Fault medical clinics (the "No-Fault Clinics) and various healthcare providers (the "Prescribing Practitioners") who prescribe DME to Insureds treating at the clinics, to steer prescriptions for the Fraudulent Equipment to the DME Providers – to the extent prescriptions were issued in the first instance.

3.      Moreover, the Defendants intentionally submitted large volumes of forged, unauthorized, and illegally duplicated prescriptions to claim reimbursement of inflated fees to which they were never entitled.  Indeed, two physicians who allegedly authorized numerous prescriptions for PEMF Devices dispensed and billed for by the DME Providers stated that they never prescribed any such device and did not even know what the device is used for.

4.      In furtherance of the scheme, the Defendants also submitted, and continue to submit, forged "Rebuttal to Peer Review Reports" (the "Peer Rebuttal Reports") in the names of various healthcare providers to the American Arbitration Association ("AAA") in connection with No-Fault insurance collection arbitrations brought by the DME Providers against GEICO and other New York insurance companies seeking reimbursement of pending claims for the Fraudulent Equipment.  The Defendants submitted the forged Peer Rebuttal Reports to corrupt the arbitration process and fraudulently mislead No-Fault arbitrators into awarding reimbursement for the Fraudulent Equipment to the DME Providers.

5.      Finally, to the extent the DME Providers actually dispensed the Fraudulent Equipment, the Defendants knew that the PEMF Devices were not medically necessary; that the devices were not legitimately prescribed; and that the prescribing and dispensing of the devices was done solely to exploit patients' No-Fault benefits and steal monies from insurance companies.

6.      By this action, GEICO seeks to recover more than $1,447,600.00 that the Defendants wrongfully obtained, and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $428,800.00 in pending No-Fault insurance claims submitted through the DME Providers, because:

> (i)      Defendants billed GEICO for the Fraudulent Equipment based on forged, unauthorized, and/or illegally duplicated prescriptions;

(ii)     Defendants, in many instances, collected, and continue to seek collection, on pending charges for the Fraudulent Equipment using forged Peer Rebuttal Reports designed to mislead the AAA and No-Fault arbitrators into awarding reimbursement for the Fraudulent Equipment to the DME Providers;

(iii)    Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(iv)    Defendants billed for the Fraudulent Equipment based on unlawful kickback and financial arrangements; and

(v)    to the extent any equipment was provided to Insureds, Defendants fraudulently inflated the bills submitted to GEICO by misrepresenting that certain charges were separately reimbursable.

7.    The Defendants fall into the following categories:

(i)    the DME Providers are New York corporations that purported to dispense the Fraudulent Equipment to persons allegedly injured in motor vehicle accidents, and then billed New York automobile insurance companies, including GEICO, seeking reimbursement for the Fraudulent Equipment;

(ii)    the Provider Owners are individuals who own and control the DME Providers, and who, along with the John Doe Defendants, used the DME Providers as part of a scheme to submit bills to GEICO and other New York automobile insurance companies for purportedly dispensing the Fraudulent Equipment to automobile accident victims; and

(iii)    the John Doe Defendants are individuals who are presently not identifiable, but who knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of the DME Providers and the dispensing of the Fraudulent Equipment, engaging in illegal financial and kickback arrangements to obtain patient referrals for the DME Providers, and furthering the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care.

8.    As discussed below, the Defendants at all times have known that the claims for Fraudulent Equipment submitted to GEICO through the DME Providers were fraudulent because: (i) Defendants billed GEICO for the Fraudulent Equipment based on forged, unauthorized, and/or illegally duplicated prescriptions; (ii) Defendants, in many instances, collected, and continue to

seek collection, on the charges for the Fraudulent Equipment using forged Peer Rebuttal Reports to fraudulently mislead the AAA and its No-Fault arbitrators into awarding reimbursement for the Fraudulent Equipment; (iii) Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (iv) Defendants billed for the Fraudulent Equipment purportedly provided to Insureds based on unlawful kickback and financial arrangements; and (v) to the extent any equipment was provided to Insureds, Defendants fraudulently inflated the bills submitted to GEICO by misrepresenting that certain charges were separately reimbursable.

9.     As such, the Defendants do not have – and never had – any right to be compensated for their claims for the Fraudulent Equipment.

10.     The charts attached hereto as Exhibits "1" and "2" set forth a representative sample of the fraudulent claims identified to date that the Defendants submitted, or caused to be submitted, to GEICO under the names of OrthoSupply 112 and Orthopain Supply.

11.     The Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry, which began in or about December 2020, continues uninterrupted through the present day in that the Defendants continue to attempt collection on the bills for the Fraudulent Equipment.

## THE PARTIES

### I.     Plaintiffs

12.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska

corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

## II.    **Defendants**

13.    Defendant OrthoSupply112 is a New York corporation with its principal place of business in Farmingdale, New York. OrthoSupply112 was incorporated on December 2, 2020, is owned by Nektalov, and has been used by the Defendants as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

14.    Defendant Nektalov resides in and is a citizen of New York. Nektalov is not and has never been a licensed healthcare provider and had no experience in the DME industry prior to incorporating OrthoSupply112.

15.    Defendant Orthopain Supply is a New York corporation with its principal place of business in Flushing, New York. Orthopain Supply was incorporated on April 8, 2021, is owned by Yusupov, and has been used by the Defendants as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

16.    Defendant Yusupov resides in and is a citizen of New York. Yusupov is not and has never been a licensed healthcare provider and had no experience in the DME industry prior to incorporating Orthopain.

17.    Despite representing the DME Providers to be two separate and distinct entities with their own names and tax identification numbers, the Provider Owners conspired to use the DME Providers as part of a single collusive scheme to defraud the No-Fault insurance industry out of millions of dollars.  For example, (i) the Provider Owners, with no prior DME experience, both decided on a whim to form the DME Providers after researching DME and stumbling across the PEMF Devices on the internet; (ii) both DME Providers solely dispensed and billed for PEMF

6

Devices manufactured by OrthoCor Medical, repeatedly submitting bills with the same four HCPCS codes for the PEMF Devices, associated pod accessories, delivery, and education services resulting in charges of $6,075.00 per patient; (iii) both DME Providers purchased the PEMF Devices from the same distributor and the same representative; (iv) both DME Providers licensed the same billing software and submitted nearly identical billing submissions to GEICO in support of their charges, including the same template prescription forms which often contained forged signatures; (v) both DME Providers received the majority of their prescriptions from the same healthcare providers – Metro Pain Specialists P.C. and its successor Tri-Borough Medical Practice, P.C.; (vi) both DME Providers submitted nearly identical, forged, Peer Rebuttal Reports to AAA in their efforts to collect on their pending No-Fault claims; and (vii) the DME Providers abruptly ceased active operations within one week of each other.

18.     Upon information and belief, the John Doe Defendants reside in and are citizens of New York.  The John Doe Defendants are unlicensed, non-professional individuals and entities, presently not identifiable, who knowingly participated in the fraudulent scheme by, among other things, assisting with the operation of the DME Providers and the dispensing of the Fraudulent Equipment, engaging in illegal financial and kickback arrangements to obtain patient referrals for the DME Providers, and furthering the predetermined fraudulent protocols used to maximize profits without regard to genuine patient care.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interests and costs, and is between citizens of different states.

20.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over claims brought

under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

21.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

22.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

<u>**ALLEGATIONS COMMON TO ALL CLAIMS**</u>

23.    GEICO underwrites automobile insurance in New York.

**I.    <u>An Overview of the Pertinent Laws</u>**

**A. Pertinent Laws Governing No-Fault Insurance Reimbursement**

24.    New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

25.    Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

26.    In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including expenses for DME and OD. See N.Y. Ins. Law § 5102(a).

27.    In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

28.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

29.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

30.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare service providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.  In Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389, 393 (2019), the New York Court of Appeals reiterated that only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

31.     New York law prohibits licensed healthcare service providers from paying or accepting kickbacks in exchange for referrals for DME. See, e.g., N.Y. Educ. Law §§ 6509-a; 6530(18); 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

32.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain

of the licensee or of a third party". See N.Y. Educ. Law §§ 6509(10), 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

33.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

34.     Alternatively, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

35.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

36.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.      Pertinent Regulations Governing No-Fault Benefits for DME**

37.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME that was provided pursuant to a lawful prescription from a licensed healthcare

provider. See N.Y. Ins. Law § 5102(a). By extension, DME that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

38.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electric moist heating pads (known as thermophores), cervical traction units, whirlpool baths, cryotherapy, continuous passive motion devices, and devices to prevent deep vein thrombosis.

39.     To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits is not artificially depleted by inflated DME charges, the maximum charges that may be submitted by healthcare providers for DME are set forth in the New York Fee Schedule.

40.     In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

41.     As it relates to DME, the New York Fee Schedule sets forth the maximum charges as follows:

> (a)     The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State

Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:

(1) the acquisition cost (i.e., the line-item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

(2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2.

42.    As indicated by the New York Fee Schedule, payment for DME is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

43.    According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

44.    For Fee Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

45.    The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto.  Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

46.     Where a specific DME does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

47.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

48.     DME suppliers are not entitled to submit separate charges for shipping, handling, delivery, or set up as the maximum reimbursement rates set forth above includes these services. See 12 N.Y.C.R.R. § 442.2(c).

49.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

    (i)    The provider is in compliance with all significant statutory and regulatory requirements;

    (ii)    the provider received a legitimate prescription for reasonable and medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;

    (iii)    the prescription for DME is not based on any unlawful financial arrangement;

    (iv)    the DME identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s); and

        (v)     the fee sought for DME provided to an Insured was not in excess of the price contained in the Medicaid Fee Schedule or the standard use for a Non-Fee schedule item.

**II.**    **Defendants' Fraudulent Scheme**

    **A.**     **Overview of the Scheme**

50.     Beginning in or about December 2020 and continuing uninterrupted through the present day, the Defendants masterminded and implemented an egregious fraudulent scheme in which they used the DME Providers to exploit patients for financial gain by billing the New York automobile insurance industry for millions of dollars in inflated charges – which they are not eligible to receive – for Fraudulent Equipment purportedly dispensed to automobile accident victims.

51.     The Defendants exploited GEICO Insureds, as well as insureds of other New York automobile insurers, by dispensing, almost exclusively, PEMF Devices (i.e., the Fraudulent Equipment) to patients at various multi-disciplinary medical clinics that primarily treat patients with No-Fault insurance (i.e., the No-Fault Clinics).

52.     As a result, Defendants, through the DME Providers, billed GEICO more than $1.8 million by submitting the exact same charges on every single bill for the exact same Fraudulent Equipment purportedly dispensed to Insureds, in large part pursuant to unauthorized, copied, or forged prescription forms from many of the same Prescribing Practitioners.

53.     Indeed, as discussed below, two physicians whose names appear on numerous prescriptions for PEMF Devices dispensed through the DME Providers confirmed that they never prescribed any such device; they do not know what the device is used for; and that their names and signatures on the prescriptions submitted to GEICO in support of the DME Providers' charges were forged or unauthorized.

54.     The Defendants operated the DME Providers for limited times periods, abruptly ceasing their active operations without any legitimate explanation.

55.     Nevertheless, as part of the fraudulent scheme, the DME Providers continue to pursue collection of the fraudulent charges from GEICO and other insurers on a bill-by-bill basis through separate No-Fault collection proceedings, where the ability of insurers to present complex fraud claims and defenses in the context of New York's expedited No-fault insurance system is significantly limited.   Moreover, on multiple instances, Defendants used forged Peer Rebuttal Reports to fraudulently mislead the AAA and its No-Fault arbitrators into awarding reimbursement to the DME Providers for the Fraudulent Equipment.

56.     The DME Providers did not market or advertise to the general public, lacked any genuine retail or office locations, and operated without any legitimate efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

57.     Similarly, the Provider Owners did virtually nothing that would be expected of the owners of legitimate DME supply companies to develop their reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

58.     Instead, the Defendants entered illegal, collusive agreements with the Clinic Controllers and various Prescribing Practitioners working at the No-Fault Clinics and steered them to prescribe and direct large volumes of the same prescriptions (or purported prescriptions) to the DME Providers for the specifically targeted Fraudulent Equipment, which equipment was purportedly prescribed and dispensed to treat patients at the No-Fault Clinics.

59.     Unlike legitimate medical supply companies that dispense a variety of DME devices and healthcare related products, the DME Providers intentionally targeted one specific

item of DME – the PEMF Device.  In fact, PEMF Devices (along with the associated items) are the only item of DME dispensed and billed by the DME Providers.

60.     The Defendants chose the Fraudulent Equipment because they could submit false claims for reimbursement to GEICO with inflated billable charges of $6,075.00 per patient.

61.     The PEMF Devices dispensed and billed by the DME Providers are marketed by OrthoCor Medical as using Pulsed Electromagnetic Field therapy to provide pain relief.  Various commercial insurers have issued policy bulletins that make clear that pulsed electromagnetic stimulation is experimental and investigational.

62.     Notwithstanding the experimental and investigational nature of Pulsed Electromagnetic Field therapy, the Defendants repeatedly purported to dispense the expensive PEMF Devices to numerous Insureds solely to maximize profits without regard to genuine patient care.

63.     By submitting bills to GEICO seeking No-Fault Benefits for the Fraudulent Equipment, the Defendants represented that they provided Insureds with a PEMF Device that was medically necessary, as determined by a healthcare provider licensed to prescribe DME.

64.     In keeping with the fact that the Fraudulent Equipment was not medically necessary but rather prescribed pursuant to predetermined fraudulent protocols and collusive kickback arrangements, the vast majority – if not all – of the many charges submitted by the DME Providers to GEICO were submitted pursuant to pre-printed, boilerplate form prescriptions containing forged, unauthorized, or illegally duplicated signatures.

65.     The pre-printed prescription forms were used by the Defendants to solicit and steer prescriptions for Fraudulent Equipment to the DME Providers.  The pre-printed prescription forms were generated at the No-Fault Clinics but never given to the Insureds for whom the Fraudulent

Equipment was intended.  Instead, as part of the scheme, the pre-printed prescription forms were routed directly from the No-Fault Clinics to the DME Providers to ensure the Insureds did not have the opportunity to fill the prescriptions with legitimate DME retailers.

66.    The pre-printed prescription forms utilized by both DME Providers to dispense and bill for the expensive PEMF Devices were identical, using the exact same format, exact same print font, and exact same language even though the DME Providers purported to be separate, independently owned companies.  In fact, each of the pre-printed prescription forms utilized by the DME Providers directed that the forms be emailed to Gmail addresses associated with the DME Providers, to wit:  OrthoSupply112@gmail.com for OrthoSupply 112 prescriptions and Orthopainsupply@gmail.com for Orthopain Supply prescriptions.  Copies of sample prescriptions submitted by the DME Providers are attached as Exhibit "3."

67.    In furtherance of the integrated scheme, the Defendants utilized the pre-printed prescription forms to justify the DME Providers' identical billing for the PEMF Devices and associated items, typically as follows:

| HCPCS Code | Description | Charge |
|------------|-------------|--------|
| E0761 | OrthoCor Device | $4500.00 |
| A9900 | Pods for OrthoCor Device | $1275.00 |
| A9901 | Delivery | $150.00 |
| 98960 | Education | $150.00 |

68.    The Defendants also primarily used forged, copied, and/or unauthorized prescriptions in the names of the same Prescribing Practitioners associated with the same professional corporation, known as Metro Pain Specialists P.C. ("Metro Pain").  Not surprisingly,

Metro Pain has been named as a defendant in recent affirmative fraud cases involving fraudulent services billed to No-fault insurers, including State Farm Mut. Ins. Co. v. Metro Pain Specialists, P.C., et al., 21-cv-05523 (E.D.N.Y. 10/5/2021) and Allstate Ins. Co. v. Metro Pain Specialists P.C., et al., 21-cv-05586-DG-RER (E.D.N.Y. 10/7/2021).

69.     Notably, Patricia Kelly, D.O. ("Dr. Kelly"), a physician formerly employed by Metro Pain and its successor company, Tri-Borough Medical Practice P.C. ("Tri-Borough"), and who allegedly authorized many of the prescriptions for PEMF Devices dispensed and billed through the DME Providers, affirmed in an affidavit that, among other things, (i) she reviewed bills and prescriptions submitted by OrthoSupply112 for OrthoCor Active Systems; (ii) she never prescribed any of the items listed on the bills submitted by OrthoSupply112; (ii) she does not know what the items listed in the bills and prescriptions are or what they are used for; (iii) the signature on the prescriptions associated with the bills is not hers; (iv) the primary No-Fault Clinic where she worked and from where the prescriptions were purportedly generated was controlled by laypersons; and (v) the testing, treatment, DME and prescriptions issued at the Metro Pain/Tri-Borough practice were part of a protocol to increase the medical billing to patients' insurance companies.

70.     Michael Alleyne, M.D. ("Dr. Alleyne"), another physician associated with Metro Pain and Tri-Borough, also stated under oath that he never prescribed any of the PEMF Devices, that he does not even know what PEMF Devices are or what they are used for, and that his signature on prescriptions for PEMF Devices submitted by the Orthopain Supply was not authorized – and likely copied or forged to make it appear as if he signed, but placed on the prescriptions without his knowledge or consent.

71.     Additionally, as stated above, both OrthoSupply 112 and Orthopain Supply sought, and continue to seek, collection on the DME Providers' bills by submitting forged Peer Rebuttal Reports to the AAA to corrupt the arbitration process and fraudulently mislead No-fault arbitrators into awarding reimbursement for the Fraudulent Equipment to the DME Providers.

72.     For example, in multiple instances, OrthoSupply112 submitted forged and unauthorized Peer Rebuttal Reports under the names of Dr. Kelly or Dr. Alleyne to the AAA in support of OrthoSupply112's billing. The forged reports falsely stated that Dr. Kelly or Dr. Alleyne concluded that it was their "opinion that the medical device provided along with the associated services by…OrthoSupply112, Inc. to the patient…was medically necessary."  The Peer Rebuttal Reports fraudulently submitted under the doctors' names contain pages and pages of completely fabricated statements regarding purported discussions relating to the patient, the DME supplied to the patient, and a "peer review" report submitted to AAA that discussed the lack of medically necessity of the PEMF Device that was dispensed by OrthoSupply112.

73.     In multiple instances, a No-Fault arbitrator working for AAA awarded reimbursement to OrthoSupply112, ruling against GEICO on the issue of medical necessity and deferring to the forged Peer Rebuttal Reports allegedly authored by Dr. Kelly or Dr. Alleyne as the provider who allegedly prescribed the PEMF Device to the patient.  However, Dr. Kelly and Dr. Alleyne never prescribed the PEMF Devices and never authored any Peer Rebuttal Reports. In fact, neither physician even knows what the PEMF Device is or what it is used for.

74.     Similarly, in multiple instances, Orthopain Supply submitted to the AAA forged and unauthorized Peer Rebuttal Reports in the name of Dr. Alleyne to support Orthopain Supply's billing. As with the fake reports submitted by OrthoSupply112, the Peer Rebuttal Reports submitted by Orthopain Supply allege that Dr. Alleyne concluded that it was his "opinion that the

medical device provided along with the associated services by…Orthopain Supply to the patient…was medically necessary."  The Peer Rebuttal Reports Orthopain Supply fraudulently submitted under Dr. Alleyne's name contain fabricated statements virtually identical to those in the Peer Rebuttal Reports submitted by OrthoSupply122 regarding completely made up patient discussions, the DME supplied to the patient, and a "peer review" report submitted to AAA that discussed the lack of medically necessity of the PEMF Device that was dispensed by Orthopain Supply.

75.     In multiple instances, a No-Fault arbitrator working for AAA awarded reimbursement to Orthopain Supply, ruling against GEICO on the issue of medical necessity and deferring to the forged Peer Rebuttal Reports allegedly authored by or Dr. Alleyne as the provider who allegedly prescribed the PEMF Device to the patient.  However, Dr. Alleyne never prescribed the PEMF Devices, never authored any Peer Rebuttal Reports, and does not know what the PEMF Device is or what it is used for.

76.     Upon information and belief, each and every Peer Rebuttal Report submitted by OrthoSupply112 and Orthopain Supply to AAA in connection with the DME Providers' efforts to obtain reimbursement of No-Fault Benefits from GEICO and other New York automobile insurers is forged and unauthorized.

**B.     The Illegal Kickback and Referral Relationships with the Clinics**

77.     Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the No-Fault Clinics form where the Defendants generated the prescription and referrals for the Fraudulent Equipment are really organized to supply a host of medically unnecessary healthcare goods and services in order to exploit patients for financial gain.

78.     Further, many of the No-Fault Clinics operate under the unlawful ownership and control of unlicensed laypersons and are nothing more than multidisciplinary medical mills organized to be convenient one-stop shops for No-Fault insurance fraud.

79.     The No-Fault Clinics that steered prescriptions for the Fraudulent Equipment to the DME Providers were likely all associated with Metro Pain or Tri-Borough, and included, among others, the following: (i) 204-12 Hillside Avenue, Hollis, New York. (ii) 105-10 Flatlands Avenue, Brooklyn, New York; (iii) 788 Southern Boulevard, Bronx, New York; (iv) 90-16 Sutphin Boulevard, Jamaica, New York; and (v) 185 Kingsland Avenue, Nutley, New Jersey.

80.     GEICO has received billing from these No-Fault Clinics from a "revolving door" of fraudulent healthcare providers, starting and stopping operations without any purchase or sale of a "practice"; without any legitimate transfer of patient care from one professional to another; and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's No-Fault insurance system.

81.     In order to obtain access to Insureds at the No-Fault Clinics, the Defendants entered into collusive arrangements with the Clinic Controllers at the No-Fault Clinics, so that the Defendants could implement and execute their fraudulent scheme and maximize the amount of No-Fault Benefits the Defendants could obtain from GEICO and other New York automobile insurers.  As part of the collusive arrangements, the Defendants steered the Clinic Controllers and the Prescribing Practitioners to direct prescriptions (or purported prescriptions) for the Fraudulent Equipment to the DME Providers in exchange for kickbacks or other financial consideration.

82.     In keeping with the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements between the Defendants and the Clinic Controllers, the

prescriptions for Fraudulent Equipment were not medically necessary and were provided, to the extent provided at all, pursuant to predetermined treatment protocols, as further explained below.

83.     In further keeping with the fact that the prescriptions for the Fraudulent Equipment were the result of unlawful financial arrangements between the Defendants and the Clinic Controllers, the prescriptions for Fraudulent Equipment were forged, unauthorized, or illegally duplicated.

84.     As a result of the unlawful financial arrangements, the DME Providers obtained large volumes of illegitimate prescriptions and large volumes of Insureds' identifying information that enabled them to submit more than $1.8 million in fraudulent billing to GEICO alone, for a single device, over a relatively short period of time, without operating any accessible retail locations, without any legitimate marketing or advertising, and without offering or selling a variety of DME products beyond the Fraudulent Equipment.

85.     In fact, as a result of the unlawful financial arrangements and despite the lack of any legitimate marketing or advertising efforts, Orthopain Supply submitted approximately $61,000.00 in claims for reimbursement to GEICO in its firth month of business while OrthoSupply 112 submitted approximately $134,000.00 in claims in its first month of business.

86.     But for the payment of kickbacks from the Defendants, the Clinic Controllers, working with the Prescribing Practitioners, would not have had any reason to: (i) direct a substantial volume of medically unnecessary prescriptions to the DME Providers; (ii) make the Insureds' information available to the DME Providers; and/or (iii) provide the DME Providers with forged, unauthorized, or illegally duplicated prescriptions.

87.     Upon information and belief, the payment of kickbacks by the Defendants was made at or near the time the prescriptions were issued, but the Defendants and the Clinic

Controllers affirmatively concealed the particular amounts paid since the payment of kickbacks in exchange for patient referrals violates New York law.

88.     As a result of the unlawful financial arrangements, the Defendants quickly billed more than $1.8 million to GEICO, and likely millions more to other New York automobile insurers, for the Fraudulent Equipment over a relatively short period of time.

**C.     The Fraudulent Equipment was Prescribed Pursuant to Fraudulent Protocols Designed to Exploit Patients for Financial Gain**

89.     In addition to the unlawful financial arrangements between the Defendants and the Clinic Controllers, the prescriptions (or purported prescriptions) that were provided to the Defendants were the result of predetermined fraudulent protocols between and among the DME Defendants, the Clinic Controllers and the Prescribing Practitioners implemented solely to maximize the billing that the DME Defendants could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

90.     The Defendants' billing for the Fraudulent Equipment virtually always included a charge totaling $6,075.00, consisting of $4,500.00 for the PEMF Device, $1,275.00 for pods, $150.00 for education, and $150.00 for delivery.

91.     Upon information and belief, in the claims identified in Exhibits "1" and "2", substantially all of the Insureds to whom the Defendants purported to provide Fraudulent Equipment were involved in relatively minor and low-impact "fender-bender" accidents, to the extent they were involved in any accidents at all.

92.     In fact, none of the Insureds identified in Exhibits "1" and "2" to whom the Defendants purported to provide the Fraudulent Equipment suffered any significant injuries or health problems as a result of the relatively minor accidents they experienced, or purported to

experience, or demonstrated any reason that justified the use of an experimental and investigational PEMF Device.

93.     In keeping with the fact that the Insureds identified in Exhibits "1" and "2" suffered only minor, if any, injuries and had no reason to be prescribed a PEMF Device, virtually all of the Insureds identified in the Exhibits sustained soft tissue injuries, such as sprains and strains.

94.     In fact, virtually all the Insureds who received a PEMF Device were already enrolled in in multidisciplinary course of treatment, typically including physical therapy and chiropractic care, and were already dispensed large volumes of other DME along with various pharmaceuticals such that there was no justification for the additional use of an experimental and investigational PEMF Device.

95.     In keeping with the fact that the prescriptions were not medically necessary but provided as part of a predetermined protocol to maximize profits, the DME Providers billed for the same exact Fraudulent Equipment purportedly provided to the Insureds identified in Exhibits "1" and "2 without regard to any Insured's individual injury or circumstance.

96.     In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints would be evaluated and an objective examination performed, and the treating provider would direct a specific course of treatment based upon the patients' individual symptoms and presentation.

97.     Here, the Defendants provided the PEMF Devices to Insureds who were purportedly experiencing musculoskeletal pain, including back, shoulder, and/or neck pain.

98.     In a legitimate clinical setting, treatment for neck, back, or shoulder pain should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or

cooling modalities, massage, and basic, non-steroidal anti-inflammatory analgesics, such as ibuprofen or naproxen sodium.

99.     If such conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.  These clinical approaches are well-established.

100.    By contrast, there is no legitimate body of evidence that establishes the effectiveness of PEMF Devices for the treatment of back, neck, or shoulder pain. In fact, various commercial insurers have issued policy bulletins that make clear that pulsed electromagnetic stimulation is experimental and investigational.

101.    Furthermore, the specific treatments or DME that may be prescribed to aid the treatment of the patient should always directly relate to the patients' individual symptoms or presentation.

102.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.

103.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in an automobile accident.

104.    It is extremely improbable that Insureds involved in different automobile accidents, but who treated at the same specific No-Fault Clinic, would warrant prescriptions for DME of substantially the same type.

105.    It is extremely improbable – to the point of impossibility – that Insureds involved in different automobile accidents, but who treated at the same specific No-Fault Clinic, would

routinely warrant prescriptions for the exact same Fraudulent Equipment—particularly a device providing experimental and investigational Pulsed Electromagnetic Field therapy.

106.    Additionally – and again in a legitimate setting – when a patient is prescribed DME by a healthcare provider, the healthcare provider would indicate in a contemporaneous evaluation report what specific DME was prescribed and why.  Such information is typically included in a contemporaneous report so the healthcare provider can recall what he previously prescribed and ask proper follow-up questions during a subsequent evaluation.

107.    In keeping with the fact that the prescriptions for the Fraudulent Equipment provided to Insureds were not medically necessary and provided, to the extent provided at all, pursuant to a predetermined fraudulent protocol, the contemporaneous examination reports written by the Prescribing Practitioners virtually never explained the reason for prescribing the Fraudulent Equipment or even referenced the prescription of the Fraudulent Equipment at all.

108.    At times, the DME Providers submitted with their billing a separate pre-printed document requesting "authorization for OrthoCor Pulsed Electromagnetic Therapy."  These authorization forms, some of which purport to be from Dr. Kelley or Dr. Alleyne, are almost certainly all forged and unauthorized.  Further, the forms themselves contain boilerplate jargon not individualized to any particular patient.

109.    Furthermore, and in keeping with the fact that the prescriptions for the Fraudulent Equipment were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that Insureds returned for a follow-up examination, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment.

110.    In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME, the healthcare provider would inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints. Such information is typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or adjust the patient's treatment as necessary.

111.    However, the Prescribing Practitioners' follow-up examination reports virtually always failed to include any information regarding the Fraudulent Equipment prescribed to the Insureds on a prior date.

112.    In keeping with the fact that the prescriptions for the Fraudulent Equipment were part of a predetermined protocol designed to maximize profits and not based upon medical necessity, the pre-printed prescriptions forms contained the same exact boilerplate language proclaiming, among other things, that the physician is "prescribing a Pulsed Electro-Magnetic Field (PEMF) Therapy device…due to my patient's needs and diagnosis."  There is, however, no discussion of any of the patients' actual individual needs and diagnoses.

113.    In every claim identified in Exhibits "1" and "2", the Fraudulent Equipment was prescribed pursuant to predetermined protocols designed to maximize profits, and not based upon medical necessity.

114.    In addition to submitting charges for the medically unnecessary PEMF Devices consisting of $4,500.00 for the PEMF Device and $1,275.00 for pods, the Defendants further inflated their fraudulent bills by submitting additional charges of $150.00 for "Delivery", pursuant to HCPCS Code A9901, and $150.00 for "Education", pursuant to HCPCS Code 98960.

115.    Under the No-Fault Laws, for the dates of service at issue, the reimbursement rates for providing or renting DME and OD includes all shipping, handling, and delivery. See 12 N.Y.C.R.R. § 442.2(c).

116.    Accordingly, the Defendants were never entitled to submit separate charges for shipping, handling, or delivery of the Fraudulent Equipment.

117.    Nevertheless, in every bill submitted to GEICO, the Defendants fraudulently misrepresented that they were entitled to submit a separate charge for delivery and set up of the Fraudulent Equipment.

118.    The Defendants submitted charges to GEICO and other automobile insurers for set up and delivery, using HCPCS Code A9901, in order to maximize the amount of No-Fault Benefits that they could receive.

119.    The Provider Owners also purported to have spent one to two hours with each Insured assisting them in setting up the device and watching instructional YouTube videos.  Upon information and belief, to the extent any Fraudulent Equipment was even dispensed and delivered to the patients by the Defendants, the Provider Owners did not spend any time whatsoever "educating" the patients on the use of the PEMF Devices.

120.    Nevertheless, in every bill submitted to GEICO, the Defendants fraudulently misrepresented that they were entitled to submit a separate charge for education services associated with the Fraudulent Equipment.

**III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO**

121.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3, HCFA-1500 forms, and/or treatment reports through the

Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

122. The Defendants' billing forms (i.e., NF-3 and/or HCFA-1500 forms) and treatment reports submitted to GEICO by and on behalf of the DME Providers were false and misleading in the following material respects:

(i)     The billing forms and supporting documentation submitted by and on behalf of the DME Providers uniformly misrepresented to GEICO that the Defendants operated lawfully in compliance with licensing laws.  In fact, the Defendants billed GEICO for Fraudulent Equipment based on forged, unauthorized, and/or illegally duplicated prescriptions;

(ii)    The billing forms and supporting documentation submitted by and on behalf of the DME Providers uniformly misrepresented to GEICO that the Fraudulent Equipment was medically necessary. In fact, the Fraudulent Equipment provided, to the extent provided at all, was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care;

(iii)   The billing forms and supporting documentation submitted by and on behalf of the DME Providers uniformly misrepresented to GEICO that the Defendants operated lawfully in compliance with licensing laws.  In fact, the DME Providers dispensed the Fraudulent Equipment purportedly provided to Insureds as a result of unlawful kickback and financial arrangements;

(iv)    The billing forms and supporting documentation submitted by and on behalf of the DME Providers uniformly misrepresented to GEICO that the Defendants operated lawfully in compliance with licensing laws.  In fact, the Defendants billed GEICO for Fraudulent Equipment as part of a scheme that included using forged Peer Rebuttal Reports to corrupt the No-fault

insurance system's arbitration process and fraudulently mislead No-fault arbitrators into awarding reimbursement for the Fraudulent Equipment to the DME Provider; and

(v)     The billing forms and supporting documentation submitted by and on behalf of the DME Providers uniformly misrepresented that certain charges for delivery and education related to the Fraudulent Equipment were reimbursable when in fact they were not.

### IV.     Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

123.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing they submitted, or caused to be submitted, to GEICO.

124.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Equipment, Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

125.    Specifically, the Defendants knowingly misrepresented and concealed facts related to their use and submission of forged, unauthorized, and illegally duplicated prescriptions by the DME Providers and the use of forged Peer Rebuttal Reports to corrupt the No-fault insurance system's arbitration process.

126.    The Defendants further knowingly misrepresented and concealed facts related to their relationship as part of an integrated scheme, by purporting to operate as two separate DME Providers, and further concealed their collusive relationships with Clinic Controllers to prevent discovery of the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

127.    Additionally, the Defendants entered into complex financial arrangements that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

128.    Additionally, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Equipment was medically

unnecessary and provided – to the extent provided at all – pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly received the Fraudulent Equipment.

129.   The Defendants also hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers and also supplied them with forged medical records and reports, including forged Peer Rebuttal Reports. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

130.   The Defendants' ongoing collection efforts through numerous separate No-Fault collection proceedings, which proceedings may continue for years, are an essential part of their fraudulent scheme since they know it is impractical for an arbitrator or civil court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address the Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area.

131.   GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. GEICO takes steps to timely respond to all claims and to ensure that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner.

132.   The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $1,447,600.00 based upon the fraudulent charges for the Fraudulent Equipment.

133.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## AS AND FOR A FIRST CAUSE OF ACTION
### Against OrthoSupply112, Orthopain Supply, Nektalov and Yusupov
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

134.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

135.    There is an actual case in controversy between GEICO and OrthoSupply112, Orthopain Supply, Nektalov and Yusupov regarding more than $428,000.00 in pending No-Fault insurance billing for the Fraudulent Equipment that has been submitted to GEICO under the names of the DME Providers.

136.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the Defendants billed GEICO for the Fraudulent Equipment based on forged, unauthorized, and/or illegally duplicated prescriptions.

137.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the Defendants, in many instances, collected, and continue to seek collection, on the charges for the Fraudulent Equipment using forged Peer Rebuttal Reports to mislead No-Fault arbitrators into awarding reimbursement for the Fraudulent Equipment to the DME Providers.

138.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care.

139.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because the Defendants claims for reimbursement for the Fraudulent Equipment are the result of unlawful kickback and financial arrangements.

140.    The DME Providers have no right to receive payment for any pending bills submitted to GEICO because, to the extent that any Fraudulent Equipment was provided to Insureds, the bills submitted by Defendants fraudulently mispresented they were entitled to reimbursement for separately billed charges for "delivery" and "education".

141.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of OrthoSupply112 and Orthopain Supply.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Against OrthoSupply112, Orthopain Supply, Nektalov and Yusupov**
**(Common Law Fraud)**

142.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

143.    OrthoSupply112, Orthopain Supply, Nektalov and Yusupov intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Equipment.

144.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that OrthoSupply112 and Orthopain Supply were properly licensed and acting lawfully and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when, in

fact, they billed GEICO for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; (ii) in every claim the representation that OrthoSupply112 and Orthopain Supply were properly licensed and acting lawfully and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when, in fact, the Defendants, collected, and continue to seek collection, on the charges for the Fraudulent Equipment using forged Peer Rebuttal Reports corrupting the No-Fault arbitration system and misleading No-Fault arbitrators into awarding reimbursement for the Fraudulent Equipment to the DME Providers; (iii) in every claim, the representation that the billed-for services were medically necessary when, in fact, the Fraudulent Equipment was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (iv) in every claim, the representation that OrthoSupply112 and Orthopain Supply were properly licensed and acting lawfully and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when, in fact the Fraudulent Equipment purportedly provided to Insureds was a result of unlawful kickback and financial arrangements; and (v) in every claim, the representation that the billed-for services were properly billed in accordance with the New York Fee Schedule, when, in fact the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently mispresented they were entitled to reimbursement for separately billed charges for "delivery" and "education".

145.   OrthoSupply112, Orthopain Supply, Nektalov and Yusupov intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through OrthoSupply112 and Orhtopain Supply that were not compensable under the No-Fault Laws.

146.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,447,600.00 pursuant to the fraudulent bills submitted by Defendants. The charts annexed hereto as Exhibits "1" and "2" sets forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO.

147.   OrthoSupply112, Orthopain Supply, Nektalov and Yusupov's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

148.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Against OrthoSupply112, Orthopain Supply, Nektalov and Yusupov**
**(Unjust Enrichment)**

149.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

150.   As set forth above, OrthoSupply112, Orthopain Supply, Nektalov and Yusupov have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

151.   When GEICO paid the bills and charges submitted by or on behalf of OrthoSupply112 and Orthopain Supply for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

152.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

153.    The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

154.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,447,600.00.

### AS AND FOR A FOURTH CAUSE OF ACTION
**Against Nektalov and Yusupov**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

155.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above as if fully set forth at length herein.

156.    OrthoSupply112 and Orthopain Supply together constitute an association-in-fact "enterprise" (the "DME Fraud Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

157.    The members of the DME Fraud Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision-making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, OrthoSupply112 and Orthopain Supply are independent business entities with different names and tax identification numbers that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

158.    The DME Fraud Enterprise operates under two separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other

36

insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the DME Fraud Enterprise acting singly or without the aid of each other.

159.    The DME Fraud Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating various professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

160.    Nektalov and Yusupov each have been employed by and/or associated with the DME Fraud Enterprise.

161.    Nektalov and Yusupov knowingly have conducted and/or participated, directly or indirectly, in the conduct of the DME Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that the DME Fraud Enterprise was not eligible to receive under the No-Fault Laws because: (i) they billed GEICO for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; (ii) they collected, and continue to seek collection, on the charges for the Fraudulent Equipment using forged Peer Rebuttal Reports to

mislead No-fault arbitrators into awarding reimbursement for the Fraudulent Equipment to the DME Providers; (iii) the Fraudulent Equipment, to the extent provided at all, was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (iv) they dispensed the Fraudulent Equipment purportedly provided to Insureds as a result of unlawful kickback and financial arrangements; and (v) the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently mispresented they were entitled to reimbursement for separately billed charges for "delivery" and "education". The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibits "1" and "2".

162.    The DME Fraud Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Nektalov and Yusupov operate the DME Fraud Enterprise, inasmuch as the DME Providers never operated legitimate medical supply companies and never were eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through OrthoSupply112 and Orthopain Supply to the present day.

163.    The DME Enterprise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the DME Fraud Enterprise in

pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,447,600.00 pursuant to the fraudulent bills submitted by Nektalov and Yusupov through the DME Fraud Enterprise.

164.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A FIFTH CAUSE OF ACTION
**Against by Nektalov, Yusupov** and **John Doe Defendants "1" through "5",**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

165.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs above as if fully set forth at length herein.

166.    The DME Fraud Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

167.    Nektalov, Yusupov, and John Doe Defendants "1" through "5" are employed by and/or associated with the DME Fraud Enterprise.

168.    Nektalov, Yusupov, and John Doe Defendants "1" through "5" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the DME Fraud Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the OrthoSupply112 and Orthopain Supply were not eligible to receive under the No-Fault Laws because (i) they billed GEICO for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; (ii) they collected, and continue to seek collection, on the

charges for the Fraudulent Equipment using forged Peer Rebuttal Reports to mislead No-fault arbitrators into awarding reimbursement for the Fraudulent Equipment to the DME Providers; (iii) the Fraudulent Equipment, to the extent provided at all, was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (iv) they dispensed the Fraudulent Equipment purportedly provided to Insureds as a result of unlawful kickback and financial arrangements; and (v) the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently mispresented they were entitled to reimbursement for separately billed charges for "delivery" and "education".  The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibits "1" and "2".

169.    Nektalov, Yusupov, and John Doe Defendants "1" through "5" knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

170.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,447,600.00 pursuant to the fraudulent bills submitted through OrthoSupply112 and Orthopain Supply.

171.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Against Nektalov
### (Violation of RICO, 18 U.S.C. § 1962(c))

172.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

173.    OrthoSupply112 is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

174.    Nektalov knowingly has conducted and/or participated, directly or indirectly, in the conduct of the OrthoSupply112'S affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that OrthoSupply112 was not eligible to receive under the No-Fault Laws because (i) it billed GEICO for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; (ii) it collected, and continue to seek collection, on the charges for the Fraudulent Equipment using forged Peer Rebuttal Reports to mislead No-fault arbitrators into awarding reimbursement for the Fraudulent Equipment to the DME Providers; (iii) the Fraudulent Equipment, to the extent provided at all, was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (iv) it dispensed the Fraudulent Equipment purportedly provided to Insureds as a result of unlawful kickback and financial arrangements; and (v) the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently mispresented they were entitled to reimbursement for separately billed charges for "delivery" and "education".   The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering

activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

175.    OrthoSupply112's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Nektalov operated OrthoSupply112, inasmuch as OrthoSupply112 never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for OrthoSupply112 to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through OrthoSupply112 to the present day.

176.    OrthoSupply112 is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by OrthoSupply112 in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

177.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,035,300.00 pursuant to the fraudulent bills submitted through OrthoSupply112.

178.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Against Nektalov and John Doe Defendants "1-5"
### (Violation of RICO, 18 U.S.C. § 1962(d))

179.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

180.    OrthoSupply112 is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

181.    Nektalov and John Doe Defendants "1-5" are employed by and/or associated with the OrthoSupply112 enterprise.

182.    Nektalov and John Doe Defendants "1"-"5" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of OrthoSupply112's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that OrthoSupply112 was not eligible to receive under the No-Fault Laws because (i) it billed GEICO for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated prescriptions; (ii) it collected, and continue to seek collection, on the charges for the Fraudulent Equipment using forged Peer Rebuttal Reports to mislead No-fault arbitrators into awarding reimbursement for the Fraudulent Equipment to the DME Providers; (iii) the Fraudulent Equipment, to the extent provided at all, was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (iv) it dispensed the Fraudulent Equipment purportedly provided to Insureds as a result of unlawful kickback and financial arrangements; and (v) the bills for Fraudulent Equipment submitted to

GEICO by the Defendants fraudulently mispresented they were entitled to reimbursement for separately billed charges for "delivery" and "education"..

183.    Nektalov and John Doe Defendants "1-5" knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

184.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1,035,400.00 pursuant to the fraudulent bills submitted through OrthoSupply112.

185.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Against Yusupov
### (Violation of RICO, 18 U.S.C. § 1962(c))

186.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

187.    Orthopain Supply is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

188.    Yusupov knowingly has conducted and/or participated, directly or indirectly, in the conduct of the Orthopain Supply's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that Orthopain Supply was not eligible to receive under the No-Fault Laws because (i) it billed GEICO for Fraudulent Equipment as a result of forged, unauthorized, or illegally duplicated

prescriptions; (ii) it collected, and continue to seek collection, on the charges for the Fraudulent Equipment using forged Peer Rebuttal Reports to mislead No-fault arbitrators into awarding reimbursement for the Fraudulent Equipment to the DME Providers; (iii) the Fraudulent Equipment, to the extent provided at all, was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (iv) it dispensed the Fraudulent Equipment purportedly provided to Insureds as a result of unlawful kickback and financial arrangements; and (v) the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently misrepresented they were entitled to reimbursement for separately billed charges for "delivery" and "education".   The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

189.    Orthopain Supply's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Yusupov operated Orthopain Supply, inasmuch as Orthopain Supply never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for Orthopain Supply to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Defendants continue to attempt collection on the fraudulent billing submitted through Orthopain Supply to the present day.

190.    Orthopain Supply is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers.   These

inherently unlawful acts are taken by Orthopain Supply in pursuit of inherently unlawful goals –

namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

191.    GEICO has been injured in its business and property by reason of the above-

described conduct in that it has paid at least $412,300.00 pursuant to the fraudulent bills submitted

through Orthopain Supply.

192.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable

attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and

proper.

**AS AND FOR A NINTH CAUSE OF ACTION**
**Against Yusupov and John Doe Defendants "1-5"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

193.    GEICO incorporates, as though fully set forth herein, each and every allegation in

the paragraphs set forth above.

194.    Orthopain Supply is an ongoing "enterprise", as that term is defined in 18 U.S.C. §

1961(4), that engaged in activities which affected interstate commerce.

195.    Yusupov and John Doe Defendants "1-5" are employed by and/or associated with

the Orthopain enterprise.

196.    Yusupov and John Doe Defendants "1"-"5" knowingly have agreed, combined and

conspired to conduct and/or participate, directly or indirectly, in the conduct of Orthopain Supply's

affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail

fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause

to be submitted hundreds of fraudulent charges seeking payments that Orthopain Supply was not

eligible to receive under the No-Fault Laws because (i) it billed GEICO for Fraudulent Equipment

as a result of forged, unauthorized, or illegally duplicated prescriptions; (ii) it collected, and continue

46

to seek collection, on the charges for the Fraudulent Equipment using forged Peer Rebuttal Reports to mislead No-fault arbitrators into awarding reimbursement for the Fraudulent Equipment to the DME Providers; (iii) the Fraudulent Equipment, to the extent provided at all, was not medically necessary and was prescribed and dispensed pursuant to predetermined fraudulent protocols designed to exploit the patients for financial gain, without regard for genuine patient care; (iv) it dispensed the Fraudulent Equipment purportedly provided to Insureds as a result of unlawful kickback and financial arrangements; and (v) the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently mispresented they were entitled to reimbursement for separately billed charges for "delivery" and "education"..

197.    Yusupov and John Doe Defendants "1-5" knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

198.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $412,300.00 pursuant to the fraudulent bills submitted through Orthopain Supply.

199.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A TENTH CAUSE OF ACTION
### Against John Doe Defendants "1-10"
### (Aiding and Abetting Fraud)

200.    GEICO incorporates, as though fully set forth herein, each and every allegation set forth above.

201.   John Doe Defendants "1"-"5" knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by Rodriguez using the Sole Proprietorship Practice.

202.   The acts of John Doe Defendants "1-5" in furtherance of the fraudulent scheme included, among other things, knowingly referring Insureds to the Sole Proprietorship Practice in exchange for illegal kickbacks from Rodriguez and knowingly participating and assisting in subjecting the Insureds to a predetermined fraudulent treatment protocol to maximize profits without regard to patient care.

203.   The conduct of John Doe Defendants "1-5" in furtherance of the fraudulent scheme was significant and material.  The conduct of John Doe Defendants "1-5" was a necessary part of and was critical to the success of the fraudulent scheme because, without their actions, there would have been no opportunity for the DME Providers to begin operating and billing for high volumes of DME so quickly, to obtain referrals of patients at the Clinics, subject those patients to medically unnecessary DME, and obtain payment from GEICO and other insurers for the Fraudulent Equipment were then billed to GEICO through the DME Providers.

204.   John Doe Defendants "1-5" aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to the DME Providers for medically unnecessary, illusory, and otherwise unreimbursable Fraudulent Equipment because they sought to continue profiting through the fraudulent scheme.

205.   The conduct of John Doe Defendants "1-5" caused GEICO to pay more than $1,447,600.00 pursuant to the fraudulent bills submitted through the DME Providers.

206.   This extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

207.     Accordingly, by virtue of the foregoing, GEICO is entitled to recover compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiffs, GEICO, demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against OrthoSupply112, Orthopain Supply, Nektalov and Yusupov, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Defendants have no right to receive payment for any pending bills, amounting to more than $428,875.00, submitted to GEICO under the names of OrthoSupply112 and Orthopain Supply;

B.     On the Second Cause of Action against OrthoSupply112, Orthopain Supply, Nektalov and Yusupov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,447,600.00, together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

C.     On the Third Cause of Action against OrthoSupply112, Orthopain Supply, Nektalov and Yusupov, a recovery in favor of GEICO in an amount to be determined at trial but in excess of $1,447,600.00, together punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

D.     On the Fourth Cause of Action against Nektalov and Yusupov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,447,600.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest, and such other and further relief as the Court deems just and proper; and

E.     On the Fifth Cause of Action against Nektalov and Yusupov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,447,600.00,

together punitive damages, costs, interest, and such other and further relief as the Court deems just and proper, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest; and such other and further relief as the Court deems just and proper.

   F. On the Sixth Cause of Action against Nektalov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,035,300.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest, and such other and further relief as the Court deems just and proper; and

   G. On the Seventh Cause of Action against Nektalov and John Doe Defendants "1-5", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1,035,300.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest, and such other and further relief as the Court deems just and proper;

   H. On the Eighth Cause of Action against Yusupov, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess $412,300.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest, and such other and further relief as the Court deems just and proper; and

   I. On the Ninth Cause of Action against Yusupov and John Doe Defendants "1-5", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $412,300.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest, and such other and further relief as the Court deems just and proper;

   J. On the Tenth Cause of Action against John Doe Defendants "1-5", a recovery in favor of GEICO in an amount to be determined at trial but in excess of $1,447,600.00, together punitive damages, costs, interest, and such other and further relief as the Court deems just and proper.

Dated:  May 5, 2023
      Uniondale, New York

                    RIVKIN RADLER LLP

                    By: _____*/s/  Michael A. Sirignano*_____
                        Michael A. Sirignano, Esq.
                        Barry I. Levy, Esq.
                        Priscilla D. Kam, Esq.
                    926 RXR Plaza
                    Uniondale, New York 11556
                    (516) 357-3000

                    *Counsel for Plaintiffs*